**EUGENE LUHR & COMPANY, a Corporation, Plaintiff,**

v.

**Jay G. PHILPOTT, District Director of Internal Revenue, Defendant.**

Civ. A. No. 3002.

United States District Court
S. D. Illinois, S. D.

March 25, 1963.

Tennie C. Leonard, Memphis, Tenn., C. E. Heiligenstein, Belleville, Ill., for plaintiff.

Edward G. Phelps, U. S. Atty., Springfield, Ill., George A. Hrdlicka, Dept. of Justice, Washington, D. C., for defendant.

POOS, District Judge.

Eugene Luhr and Company, a Corporation, plaintiff, is an Illinois Corporation, with its principal office at Columbia, Monroe County, Illinois. It is engaged in the contracting business. During the years of 1956, 1957 and 1958 it had a contract with the United States through the Army Corps of Engineers to place rip-rap rock along the shore of the Missouri River in the vicinity of Plattsmouth, Nebraska City, Peru and Brownville, Nebraska, and Bartlett and Percival, Iowa. The contracts for the various rip-rapping projects contained date deadlines by which the various projects were to be completed to avoid penalty clauses. At commencement of the rip-rapping projects, plaintiff either purchased rock at various quarries and hired truckers to deliver the rock at either barge, job or dock sites, or purchased rock from quarries who hired truckers to deliver the rock for plaintiff's use in the performance of government contracts at various sites along the river bank. The truckers, in the performance of these contracts, were governed by haulage rates fixed by the Nebraska State Railway Commission. These rates were adequate for over-the-road hauling. However, due to river bank conditions, truckers could not survive under these rates. The haulage conditions, due to mud, water, debris, etc., were of such severity that trucks, in order to get to the various sites, had to be pulled through with bulldozers, heavy tractors, etc. At times the front ends would be pulled from under the trucks. These conditions were so bad that

truckers refused to haul rock and stone to plaintiff's job sites, and the work stopped for lack of rock and stone.

At this stage, plaintiff through its Vice-President, Alois Luhr, went to Nebraska and discussed the matter with various truckers who flatly refused to haul any additional rock or stone under the Nebraska Railroad Commission rates, and based their reasons on the existing haulage conditions. The plaintiff, confronted with meeting contract date lines, and the refusal of the truckers to haul rock and stone under the haulage conditions, was forced to enter into a third type of doing business; that of entering into written contracts with various truckers to purchase stone from them, delivered to the various sites where the stone was needed. These purchase contracts met the burdensome haulage conditions pricewise, and enabled plaintiff to procure rock. The type of contract entered into is as follows:

"Contract of Sale.

"This contract of sale entered into this 23rd day of September, 1957, by and between EUGENE LUHR & CO., hereinafter called the Buyer, and the undersigned duly licensed and qualified dealer in rock and stone, hereinafter called the Seller,

"WITNESSETH:

"The Seller has this day sold and the Buyer has purchased Rip-rap stone delivered to *Structures No. 628.65, 629.0 and 629.21* near *River mile 603* in the vicinity of *Bartlett, Iowa,* at the rate of *1.75* for each ton delivered.

"The Seller agrees to deliver rock in accordance with the specifications of the contract of the Buyer with the Corps of Engineers, known as Project. *DA–25–066–CIVENG–57–137.*

"Buyer agrees to pay the Seller monthly on the 15th of each month for all rock delivered during the previous month.

"The Seller states that he is a dealer in rock and stone, and has previously bought and sold stone or rock.

"This contract is binding on the successors and assigns of the parties hereto.

"EUGENE LUHR & CO.

By: <u>Alois Luhr</u>

Buyer.

<u>Melvin Brownlee</u>

Seller"

This contract was Exhibit 2. Plaintiff also entered into three additional contracts of sale, Exhibits 3, 4 and 5, with this person, to deliver the rock at various sites. The seller purchased the rock from various quarries, and paid for it. The delivered price, under Exhibit 3, was $1.91 per ton; under Exhibit 4 it was $1.93 per ton; and under Exhibit 5 it was $1.47 per ton. Three contracts of sale were. executed by plaintiff with Wurtete Brothers Rock Co., Exhibits 6, 9 and 10, at $1.75 per ton; $1.10 per ton, and $1.41 per ton, respectively, delivered at designated job sites; three contracts of sale were executed with Kenneth Wurtete, Exhibits 7, 8 and 11, for $1.91 per ton, $1.93 per ton, and $1.47 per ton respectively, delivered at various job sites; four contracts were executed with Carrol Gilland, Exhibits 14, 15, 16 and 24, for $1.91 per ton, $1.75 per ton, $1.93 per ton, and $1.47 per ton, delivered at various job sites; four contracts were entered into with Lester Gilland, Exhibits 17, 18, 19 and 20, for $1.91 per ton, $1.75 per ton, $1.37 per ton, and $1.93 per ton, delivered at various job sites; and three contracts were executed with Bob Gilland, Exhibits 21, 22 and 23, for $1.47 per ton, $1.91 per ton, and $1.75 per ton, respectively, delivered at various job sites. There is no evidence that these contracts were entered into for the purpose of evading the hereinafter set out haulage tax.

At the time of the contracts above set out there was, in full force, a tax statute which provided:

"(a) Tax. There shall be imposed upon the amount paid within or without the United States for the transportation of property by rail,

motor vehicle, water, or air from one point in the United States to another, a tax equal to 3 per centum of the amount so paid, except that, in the case of coal, the rate of tax shall be 4 cents per short ton. Such tax shall apply only to amounts paid to a person engaged in the business of transporting property for hire, including amounts paid to a freight forwarder, express company, or similar person, but not including amounts paid by a freight forwarder, express company, or similar person for transportation with respect to which a tax has previously been paid under this section. In the case of property transported from a point without the United States to a point within the United States the tax shall apply to the amount paid within the United States, for that part of the transportation which takes place within the United States. The tax on the transportation of coal shall not apply to the transportation of coal with respect to which there has been a previous taxable transportation."

26 U.S.C.A. § 3475(a) (enacted 1939, repealed 1958). As above noted, the proof shows that plaintiff, in the performance of its contract for rip-rapping with the Corps of Engineers, obtained rock under the following three methods:

(1) The stone was purchased from quarries at a contract price delivered to plaintiff's job sites.

(2) The stone was purchased at quarries and truckers were hired to haul it from the quarries to job site.

(3) The stone was purchased from individuals or concerns, not employees of plaintiff, at a contract price delivered to job site, in which case the individuals or concerns purchased and paid for the stone from the quarries and sold and delivered it to plaintiff at job site, and plaintiff paid the individuals for it monthly.

The 3 per cent transportation tax on the first two methods has been paid, and is not questioned here.

The United States taxed plaintiff on the third method. The tax has been paid under protest, and the suit here is to recover the tax which plaintiff says has been illegally laid.

Plaintiff states, and the evidence shows, that plaintiff's work for the United States Corps of Engineers was at a standstill because truckers could not profitably operate on a mileage basis. Penalty provisions of plaintiff's contract necessitated a solution. Negotiations were consummated as above shown, with truckers of rip-rap rock for a contract profitable to truckers, most of whom were dealers in rock and stone. The sub-contracting truckers would purchase stone at a quarry of their choice, where they obtained rock at satisfactory prices and delivered rock to plaintiff's job site at a unit basis price per ton as above set out. The truckers, who identify themselves as sellers in the respective herein set out contracts, paid the quarries by their own checks, as shown by plaintiff's Exhibits 13 and 13a, checks, one of which, Exhibit 13, was in the amount of $3,-393.19, drawn on the account of Melvin Brownlee at the Bank of Craig, Missouri, and the other in the amount of $825.02, drawn on the account of Lester Gilland on the Exchange Bank of Mound City, Missouri, both made payable to Colaska Production Company for stone, and identified as paid for stone used in rip-rapping by plaintiff.

The evidence shows that all the rock used under the third, or contract method, was paid for by individual truckers to the various quarries. Plaintiff, under these contracts, paid the trucker sellers, and at no time, under the third method, had anything to do with the quarries. Rock lost while under transportation to plaintiff's job sites, (several occasions were shown by the evidence), was the loss of the seller truckers. The seller truckers actually and physically owned the rock until sold, and delivered to plaintiff at plaintiff's job site, at a per ton unit delivered price.

The truckers made no separate charges to plaintiff for transportation. The

plaintiff argues that the Internal Revenue Service arbitrarily assessed the difference between the plaintiff's purchase price of the rock, and the seller trucker's purchase price of the rock, as "transportation costs", thereby ignoring the profit of the truckers or any quarry discounts to the truckers. Plaintiff further argues that defendant's case is based upon speculation and improper drawn inference, and not on facts and evidence.

The defendant says the transportation charge represents the difference between the "selling price" of the stone, and the "cost" of the stone to the truckers. (Defendant's Exhibit 5, page 4).

The Internal Revenue Service made the following direct assessments to plaintiff:

| | |
|---|---|
| 12/10/1956 | 348.39 |
| 2/10/1957 | 8.44 |
| 3/10/1957 | 4.73 |
| 4/10/1957 | 323.07 |
| 5/10/1957 | 574.50 |
| 6/10/1957 | 1,300.21 |
| 7/10/1957 | 632.28 |
| 8/10/1957 | 765.97 |
| 9/10/1957 | 285.01 |
| 10/10/1957 | 181.03 |
| 11/10/1957 | 257.70 |
| 12/10/1957 | 182.69 |
| 2/10/1958 | 236.78 |
| 4/10/1958 | 548.99 |
| 5/10/1958 | 936.89 |
| 6/10/1958 | 556.62 |
| Total: | $ 7,143.30 |

This was arrived at as the Government, in its brief, says that under the third method the Internal Revenue Service determined that plaintiff had paid the respective trucker sellers during the period in question for rip-rap rock a total of $412,870.88, for which the seller truckers paid the quarries a total of $202,577.56, and that the difference, $210,293.32, represents taxable transportation charges, a figure of $7,143.30. In this total is included $864.50, unpaid tax, under methods 1 and 2, which plaintiff does not dispute.

The defendant further argues:

"It is the Director's contention that the tax was properly assessed and collected for the reason that under the third method of obtaining rock used by plaintiff, the difference between the predetermined amounts received by the truckers for rock delivered to the job site, and the predetermined amounts paid by the truckers for the rock at the quarry represented amounts paid for the transportation of property to truckers for hire."

Under the evidence, this assertion of the portion the Director sets up as transportation charges, does not stand up for the reason that the Director allows no portion of this arbitrary figure for profit of doing business, nor does it take into consideration any fluctuation in the market price of rock that the truckers necessarily assumed in contracting to deliver at a unit price per ton, nor does it take into consideration the loss of rock due to spillage and breakdowns as shown by two specific instances in this record, etc.,

"The position of the Internal Revenue Service is that title to the property in the carrier at the time of the transportation is not necessarily controlling in determining whether the transportation services were taxable services. The test applied is the so-called primary business test, with the finding for or against a carrier for hire status turning upon the sole question of fact as to the primary business of the transporter. Thus, in general, in order for a trucker who buys and sells a commodity which he transports to be regarded as primarily engaged in the business of buying and selling such commodity, there must exist a chance of profit or loss from the purchase and sale of the commodity."

Under this position of the Director, viz., "property in the carrier is not controlling because it fails to meet the test

of 'primary business of the carrier' in that there must exist a chance of profit or loss from the purchase or sale of the commodity", and that the "trucker must assume the risk of being able to purchase the commodity at a price low enough to yield a profit on the purchase and sale of a commodity in ordinary buying or selling transactions", the Director makes an assumption not justified under the evidence. The work of plaintiff was at a standstill because the truckers could not afford to haul under the Nebraska Railway Commission rates, because of adverse weather and haulage conditions, such as moving over mud roads, through swamp and backwashes and debris deposits, etc. They refused to haul because they operated at a loss. They then entered into written contracts to make direct sales to plaintiff on a per ton unit basis. Some of the rock was to cost the plaintiff $1.10 per ton, some $1.41 per ton, some $1.47 per ton, some $1.75 per ton, some $1.91 per ton, and some $1.93 per ton. Under this arrangement, the truckers delivered the rock until the work was completed. Inferentially this demonstrates the profit motive, because they were able to procure rock at a cost that enabled them to make a profit; otherwise they would not have been able to complete delivery. The record also shows that the seller truckers lost rock in at least two instances where they had to stand the loss. The record justifies the fact that during the cause of the deliveries under the contracts, the seller truckers were primarily engaged in and buying and selling rip-rap rock at a profit. The record further shows that it was the customary practice for the industry and other contractors in this area to enter into negotiated contracts of buying and selling of rock delivered at job site. The evidence shows the plaintiff was able to perform its contracts with the Corps of Engineers after plaintiff went to the contract price for rock delivered on the job; that the plaintiff's contracts with the Corps of Engineers could not be fulfilled prior thereto because the truckers were not available, in

that they refused to haul on any other basis; that the truckers wanted the option of obtaining materials of their choice (R. p. 11); that the buy and sell contracts had to be made to meet the competition; that the truckers refused to haul for plaintiff on a flat rate basis, the rate set by the Nebraska Railway Commission, under easy haul conditions, because the haulage of rip-rap rock was adverse to their trucks; that the road conditions were adverse, thereby necessitating a flat delivered price in order to enable the truckers to exist (R. p. 13); and that for these reasons the contract (buy and sell) called for a much higher price and for more profit; that in hauling rock to job sites the seller truckers had to use other equipment such as bulldozers to get the rock delivered (R. p. 14); that these contracts (buy and sell) were entered into by dealing with reliable truckers who looked over the job, checked the miles and road conditions, and then, from submitted rates, the plaintiff would take the lowest responsible bids, and that the cost per ton was set on this basis (R. p. 15); and that the only way the plaintiff could get its work completed was to pay the higher amount of money for the rock, and that these buy and sell contracts were not entered into a defeat the tax, nor did the trucker sellers ever separate the costs between the price of the rock and the transportation in making the price per ton arrangement; that the price was a flat one based upon the job site, or barge site, delivery; that plaintiff had no responsibility for the rock while it was under haulage from the respective quarries to the job site, nor did plaintiff own the rock at and during this time (R. p. 16); that no losses were paid for by plaintiff; nor did plaintiff direct the seller truckers where to purchase rock, purchases being made from three different quarries; that the truckers actually entered into negotiations with the quarries to get the best price obtainable; that plaintiff never paid the quarries, but paid the seller truckers; that the prime reason for the buy and sell contracts with the individuals was

to get delivery of enough rock on the river bank (R. p. 18), and that some of the truckers actually subcontracted for rock delivery with other truckers. The non-contract parties with whom the seller truckers subcontracted were Glen Bolinger, J. P. Nichols, Charles Lewis, Jack Meredith, Ray Nichols, Harvey Wilkie, John Klasmeyer, George Paulas, and Floyd Carmichael. (Plaintiff's Exhibit 12.)

The record further shows that the agent who assessed the tax stated to Eugene Luhr that he assumed the avererage price of rock at the quarry, and then deducted this amount from the total paid the trucker and that he made no breakdown of what he considered the profit of the trucker on the rock sold over and above transportation, nor did he take into consideration any rebate from quarry to trucker. The record shows that the agent, in making the assessment, placed a total figure of $412,-870.78 for rock purchased by plaintiff, and a total figure of $202,577.56 as cost to seller truckers. There is no showing in the record as to where the agent procured these figures, the record merely showing in Defendant's Exhibit 5, that these were the figures used in making the calculations, and that he arrived at a total difference between these amounts in the sum of $210,293.32 on which he assessed the tax. The Government assumes this figure arbitrarily as the amount on which the tax was to be assessed. It bases it on no factual consideration in that it fails to take into consideration out of this figure any profit, allows nothing for loss, nothing for cost of operation, breakage of property, depreciation on property, gasoline and oil costs, insurance, repairs, etc., all of which enter the picture of buying and selling rock for profit. He, in fact, arbitrarily states, "the transportation charge represents the difference between the 'selling' price of the stone, and the cost of the stone to the trucker", without taking into consideration any cost of operation.

The Government offers no evidence to show, nor is there any suggestion, that plaintiff was, in any way, attempting to evade the tax.

Factually, this case is very similar to the factual situation in the case of Consolidated Engineering Company, Inc. v. United States, D.C., 201 F.Supp. 828. This case held that the tax was erroneously assessed and levied. The Court there held that a building contractor, which accepted lowest bid for building supplies delivered at job site for unit price per ton, and which did not agree to pay any portion of successful bidder's charge for carriage of material, was not "shipper" within statute imposing 3 per cent transportation tax, and was not liable for tax.

Accordingly, the Court finds and holds that the tax was arbitrarily fixed and assessed; that there is no basis in the evidence to justify the imposition of the tax, and that under the law the contract of purchase and the delivery of rock thereunder was not "transportation of property" under the above quoted section of the "Act"; and that plaintiff is not liable for the tax in question, except in the sum of $864.50, unpaid portion of tax found by the Internal Revenue Service to be due for the transportation tax under methods 1 and 2, as above set out; that the portion of the tax illegally assessed amounts to $6,278.80.

The facts as herein set out, and the law as herein stated, are adopted as the findings of fact and conclusions of law, and judgment will be entered in favor of plaintiff and against the defendant for the sum of $6,278.80, with interest as provided by law.